IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs December 16, 2014

**STATE OF TENNESSEE v. JOSEPH NEWTON**

**Appeal from the Criminal Court for Davidson County**
**No. 2010D2957     Seth W. Norman, Judge**

_____

**No. M2014-00603-CCA-R3-CD - Filed April 2, 2015**

_____

The defendant, Joseph Newton, was convicted of two counts of rape, Class B felonies, which the trial court merged. He received an effective eight-year sentence. On this direct appeal, he raises the sole issue of ineffective assistance of counsel. He argues that trial counsel was ineffective for: (1) failing to pursue a reasonable defense and failing to provide assistance; (2) failing to fulfil a promise made in the opening statement that the defendant would testify; and (3) for statements made during closing arguments. He also contends that the cumulative effect of trial counsel's errors operated so as to deprive him of his right to receive a fair trial. After thoroughly reviewing the record, the briefs of the parties, and the applicable law, we affirm the judgment of the criminal court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Criminal Court Affirmed**

JOHN EVERETT WILLIAMS, J., delivered the opinion of the Court, in which THOMAS T. WOODALL, P.J. and ROBERT W. WEDEMEYER, J., joined.

Stacey Marie Angello, Hermitage, Tennessee, for the appellant, Joseph Newton.

Herbert H. Slatery III, Attorney General and Reporter; Tracy L. Alcock, Assistant Attorney General; Glenn Funk, District Attorney General; and Dan Hamm, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

## FACTS AND PROCEDURAL HISTORY

The victim testified that on November 17, 2009, she attended a work-related dinner, where she consumed several alcoholic drinks. She subsequently drove her vehicle to several different bars and continued to consume alcohol. The last bar that she visited was Broadway Brewhouse, located at the corner of 19th Avenue and Broadway in Nashville. When the bar closed at 3:00 a.m., several bar employees and the victim mutually agreed that the victim should depart in a taxi.

Douglas Tribble was working as a barback at Broadway Brewhouse and remembered having a conversation with the victim. Mr. Tribble became concerned that the victim may have consumed too much alcohol, and he spoke with his manager about placing her in a taxi. Mr. Tribble explained to the victim that he did not believe it was a good idea for her to operate her vehicle, and the victim agreed. Mr. Tribble exited the bar with the victim to assist her in hailing a cab. He recalled that he flagged down a white Allied taxi that was operated by a black male. He could not see the driver's face in detail because it was dark and the taxi was across the street, but he made a notation that the taxi's number was either "70, 71, or 77."

Mr. Tribble testified that it was his habit always to note the number of a cab if he placed a person into the cab. He began this practice after an incident that occurred many years earlier with a co-worker. Mr. Tribble placed his co-worker in a cab and learned the next day that the driver had assaulted the co-worker, stolen her money, "and then left her on the side of the road for dead." After the incident, Mr. Tribble promised himself "that if anytime [he] ever put somebody in a cab, [he] would always remember the number of the cab."

When the victim entered the taxi, she informed the driver that she wished to go to "Belmont off of 18th Avenue." The taxi started in that direction, but when the victim asked the driver to turn left on Magnolia, the cab continued straight instead of turning. Initially, the victim believed that the driver had simply missed the turn and would turn around to take her to her destination. However, the driver turned to her and told her to "shut up."

After continuing to drive, the driver "whipped into a cul-de-sac." He climbed into the backseat of the taxi and forced himself on the victim. He pulled down the victim's pants and underwear and penetrated her vagina with his penis. The victim did not consent to this action, and she was fearful while it was happening. The victim believed that the assault lasted "maybe 10 minutes or 15 minutes, five minutes" but stated that "[i]t felt like two hours[.]"

The defendant returned to the driver's seat of the taxi after penetrating the victim. The victim immediately exited the taxi, running "as fast as [her] legs would take [her]." She purposefully left the door of the taxi open to slow the driver down, in case he attempted to pursue her. The victim ran into a well-lit area of "an apartment or condo community" and telephoned police.

Officer Paul Goebel of the Metropolitan Nashville Police Department responded to the victim's call. He testified that he arrived at the apartment complex around 4:00 a.m. and that the victim informed him that she had been attacked a short distance from the apartment complex. Officer Goebel noted that the victim appeared to be intoxicated but stated that she was able to articulate what had occurred. He testified that the victim never attempted to conceal the fact that she was intoxicated. The victim told him that a black male between the ages of twenty-seven and thirty-two years old attacked her. After speaking with the victim for a few moments, Officer Goebel transported her to General Hospital, where a nurse practitioner performed a "Medical/Legal Examination" and a rape kit.

Connie Lynn Barrow was the nurse practitioner who was on call for the Sexual Assault/Victim Response Team when the victim came to General Hospital. She testified that as part of her duties, she took the medical forensic health history of the victim, performed a "head to toe physical assessment," examined the victim for trauma, and collected any evidence that she "deem[ed] to be appropriate." Ms. Barrow observed a small, "slightly purple" bruise on the victim's right breast and a "small reddened abrasion" on the victim's right knee. She asked the victim if her assailant had kissed her anywhere, and the victim responded that he may have attempted to kiss her on her breast and mouth. Ms. Barrow administered swabs to the victim's mouth and face in order to detect any potential saliva left by the attacker. She performed a swab of the outside and inside of the victim's vagina to check for semen, along with a cervical swab of her vagina and a swab around her anus. Ms. Barrow also performed a "cervical culture checking" for gonorrhea, and she treated the victim for gonorrhea.

Detective Robert Carrigan, a Metropolitan Nashville police officer, worked in the Sex Crimes Division. He testified that he arrived at the hospital after the victim was transported and that he spoke with her before Ms. Barrow conducted her examination. He observed that the victim "appeared extremely intoxicated" and had trouble remaining awake. Detective Carrigan noted that "[i]t was just a difficult time for an interview." In this first interview, the victim described her assailant as a black male with medium skin tone. In a subsequent interview several days later, the victim described her attacker as a "[l]ight skinned male black." The only variation in the two interviews of the description of her attacker was his skin tone. He spoke with her several days later, when she was far more "lucid."

Detective Carrigan testified that the swabs taken from the victim were sent to the Tennessee Bureau of Investigation (TBI) crime lab for analysis. Semen was discovered on the vaginal and peri-anal swabs, but the DNA profile did not reveal a match with anyone currently in the TBI system. After speaking with the manager on duty at Broadway Brewhouse the evening of the incident and with Mr. Tribble, Detective Carrigan began to develop the drivers of Allied taxi cabs 70, 71, and 77 as potential suspects. The defendant was the driver of cab number 70. Detective Carrigan spoke with all three drivers, and all three agreed to provide a consensual DNA swab. When Detective Carrigan showed the defendant a photograph of the victim, he denied having ever seen, met, picked up, or provided a ride to the victim. He also denied ever having a sexual relationship with anyone inside of his taxi.

Detective Carrigan sent the DNA swabs of the three drivers to the TBI laboratory, and testing revealed a positive match between the semen found in the swabs taken from the victim and the defendant's DNA profile. Several days after learning of this match, Detective Carrigan showed the victim a photograph lineup that included a photograph of the defendant. He had shown the victim several prior lineups of Allied taxi cab drivers, but the victim did not select any of the men in the photographs as her attacker. After viewing the lineup with the defendant's photograph, the victim selected that photograph, stating that she was "70% sure" that it was a photograph of her attacker. She clarified that seventy percent sure meant "that [she] was pretty darn sure."

Special Agent Bradley Everett worked for the TBI Crime Laboratory as a special agent forensic scientist and DNA technical leader for the TBI. After receiving the defendant's DNA swab, Special Agent Everett found that the defendant's DNA profile matched that of the sperm found in the swabs taken from the victim. He testified that the probability of an individual other than the defendant having that DNA profile was greater than the world population. He further opined that "it would be scientifically unreasonable to assume" that the DNA profile did not come from the defendant.

The defense did not put on any proof. Although trial counsel informed the jury in his opening statement that the defendant would testify, the defendant did not do so. Trial counsel began his closing argument by stating that he "would submit that in the absence of DNA in this case, this case would be a loser." He further told the jury, "I told you in opening statements that [the defendant] was going to testify. Typically in law school they tell you not to tell the jury what they can expect to hear, but this was a [tactical] decision so if you're going to blame anybody blame me, just don't hold it against [the defendant.]" Trial counsel also stated, "This is an identity case. There was a rape and there was no consent, that is not even an issue. There was a rape but the issue is identity."

4

At the conclusion of the proof, the jury found the defendant guilty of two counts of rape. The trial court merged both counts and sentenced the defendant to an eight-year sentence. At the motion for new trial hearing, the defendant raised only the issue of ineffective assistance of counsel, and trial counsel testified.

Trial counsel testified that, prior to trial, he was aware that the State had DNA evidence identifying the defendant as the perpetrator of the rape of the victim. He stated that he hired an expert to attempt to refute the testimony of the State's DNA expert and that his expert was unable to provide an opinion that would refute that of the State. He said that he had several discussions prior to trial about whether the defendant would testify at trial. Trial counsel informed the defendant that if he testified at trial, a consent defense would be the only plausible defense to the charge, in light of the State's DNA evidence. Trial counsel believed that if the defendant were to testify that he did not commit the crime, the testimony would have been unhelpful because it would have been inconsistent with the State's DNA findings.

Trial counsel met with the defendant "in person at least eight times" and spoke with him numerous times on the telephone. Trial counsel testified that the "defense shifted weekly from not there, to it was consensual, to even she attacked him." A week before the trial, after speaking with the defendant, trial counsel had established that their trial strategy would be to assert a defense of consent. Trial counsel prepared a potential cross-examination of the victim to use when employing the consent defense. However, on the day of trial, the defense "shifted to I didn't do it again." The defendant wanted trial counsel to argue that he was not at the scene of the crime, despite the DNA evidence, and he informed trial counsel that he wished to testify.

When trial counsel told the jury that the defendant would testify, he did so after the defendant informed him that he would testify. Trial counsel anticipated that the defendant would testify that he was not present at the scene of the crime and did not rape the victim. He agreed that such testimony would be inconsistent with the scientific proof offered in the case. Trial counsel stated that he attempted to maintain a defense that was consistent with his client's desires but that "every case [was] different." Trial counsel said that on the day of the trial, the defendant "insisted that he did not do it, and -- but he still wanted to testify[.]" As a result, trial counsel's strategy was to abandon the consent defense and adopt the theory that the defendant was not the person who raped the victim.

Trial counsel testified that he informed the defendant of his belief that the strategy of claiming that he did not rape the victim "was not the best strategy to pursue[.]" The defendant disagreed, and trial counsel continued with the defense of mistaken identity because the defendant would not adopt a defense of consent.

5

Trial counsel testified that his biggest obstacle as counsel was "getting [the defendant] to agree on any defense consistently[.]" He stated that the defendant decided not to take the stand after hearing the State's proof and that trial counsel believed this was a smart decision. Trial counsel agreed that if the defendant testified that the encounter was consensual, it would have been inconsistent with the statement that he gave to Detective Carrigan. He further agreed that the proof showed that the defendant did not take the victim where she wished to go and that she jumped out of the taxi cab in a deserted area. He confirmed that the victim's behavior was not consistent with the behavior of a person who had engaged in consensual sex. Trial counsel testified that because the victim "was such a strong witness[,]" he was unsure how successful it would have been to raise a defense of consent.

During closing arguments, the trial court asked defense counsel the following:

Are you creating a new defense for every defendant that comes down the line because he tells his lawyer I insist that you get up and tell this jury that I'm going to testify, and then he says I'm not going to testify so I'm entitled to a new trial because my lawyer said that I was going to testify and I didn't? Now what is to prevent every defendant that ever walks into this courtroom from doing that?

. . . .

If your client tells you I want you to tell that jury that I'm going to testify because I am going to testify, are you telling me that you wouldn't stand up here and tell that?

. . . .

You are not going to get up and do what your client asked you to do?

. . . .

Then you are ineffective, are you not?

The trial court denied the motion for new trial, finding that "everything that [trial counsel] did was effective in this matter." The defendant filed a timely notice of appeal, and we proceed to consider his claims.

6

## ANALYSIS

## I. Ineffective Assistance of Counsel

This court has repeatedly stated that raising a claim of ineffective assistance of counsel on direct appeal is a practice "fraught with peril." *State v. Blackmon*, 78 S.W.3d 322, 328 (Tenn. Crim. App. 2001). We review claims of ineffective assistance of counsel raised on direct appeal under the same standard as those raised in post-conviction proceedings. *State v. Burns*, 6 S.W.3d 453, 461 n.5 (Tenn. 1999). The defendant bears the burden of proving the allegations of fact giving rise to the claim by clear and convincing evidence. *Dellinger v. State*, 279 S.W.3d 282, 293 (Tenn. 2009). "'Evidence is clear and convincing when there is no serious or substantial doubt about the correctness of the conclusions drawn from the evidence.'" *Grindstaff v. State*, 297 S.W.3d 208, 216 (Tenn. 2009) (quoting *Hicks v. State*, 983 S.W.2d 240, 245 (Tenn. Crim. App. 1998)).

Both the Sixth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution guarantee the right to counsel. This right affords an individual representation that is "within the range of competence demanded of attorneys in criminal cases." *Baxter v. Rose*, 523 S.W.2d 930, 936 (Tenn. 1975). Counsel is ineffective when "counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." *Strickland v. Washington*, 466 U.S. 668, 686 (1984).

In order to prevail on a claim of ineffective assistance of counsel, the petitioner must prove by clear and convincing evidence that: (1) counsel's performance was deficient; and (2) the deficiency prejudiced the petitioner to the degree that the petitioner did not receive a fair trial. *Strickland*, 466 U.S. at 687. A petitioner satisfies the deficiency prong of the test by showing that counsel's representation fell below an objective standard of reasonableness; that is, "the services rendered or the advice given must have been below 'the range of competence demanded of attorneys in criminal cases.'" *Grindstaff*, 297 S.W.3d at 216 (quoting *Baxter*, 523 S.W.2d at 936); *see Strickland*, 466 U.S. at 687. The petitioner must demonstrate that "counsel made errors so serious that counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment." *Strickland*, 466 U.S. at 687. Courts evaluating the performance of an attorney "should indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance." *State v. Burns*, 6 S.W.3d 453, 462 (Tenn. 1999). In order to fairly assess counsel's conduct, every effort must be made "to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time." *Strickland*, 466 U.S. at 689. "The fact that a particular strategy or tactic failed or hurt the defense, does not, standing alone, establish unreasonable

representation." *Goad v. State*, 938 S.W.2d 363, 369 (Tenn. 1996).

Prejudice requires the petitioner to show "that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694. "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* If the petitioner fails to establish either deficiency or prejudice, post-conviction relief is not appropriate, and this court need not address both components if the petitioner makes an insufficient showing as to one component. *Grindstaff*, 297 S.W.3d at 216 (citing *Goad*, 938 S.W.2d at 370).

## A. Failure to Pursue a Reasonable Defense

The defendant argues that trial counsel was ineffective because he failed to present a reasonable defense and failed "to provide assistance." He contends that because trial counsel knew that the defendant's DNA matched the sperm taken from the victim and because there were only minor inconsistencies in the victim's description of her attacker that a defense of consent would have been more appropriate. He also contends that because he was an immigrant to the United States, he was unqualified to make strategic decisions relating to his defense.

Trial counsel is "essentially bound" by a competent defendant's knowing and voluntary selection of a particular defense strategy. *Zagorski v. State*, 983 S.W.2d 654, 658-59 (Tenn. 1998). In *Zagorski*, our supreme court addressed the issue of "whether a lawyer should follow the lawful demands of his client when those demands may cause detriment to the client's case." *Id.* at 658. In concluding that trial counsel were not ineffective in following the petitioner's request that they not present mitigating evidence at his capital sentencing hearing, the court, citing Tennessee Supreme Court Rule 8, stated that "[g]enerally, the client has exclusive authority to make decisions about his or her case, which are binding upon the lawyer if made within the framework of the law." *Id.* at 657, 658. The role of counsel in a criminal case "is to assist the defendant in making a defense and to represent the defendant before the court." *Id.* at 658. This assistance insures "that the defendant is fully advised of his or her rights, the available defense strategies, and the consequences of pursuing one strategy over another." *Id.* While trial counsel may warn the defendant about consequences that may stem from pursuing an ill-advised legal strategy, "the right to a defense belongs to the defendant." *Id.*; *see State v. Terry Norris*, No. W2000-00707-CCA-R3-CD, 2002 WL 1042184, at *14 (Tenn. Crim. App. May 21, 2002) (concluding that while trial counsel was obligated to defer to the defendant's desire to pursue a strategy of self-defense rather than voluntary manslaughter, any error in adopting a voluntary manslaughter defense did not result in prejudice). "If the defendant is prejudiced in some respect by his own decision, he should not later be heard to complain about those

consequences by challenging the conduct of his counsel." *Zagorski*, 983 S.W.2d at 659. This is precisely what the defendant attempts to do in the case *sub judice*.

Prior to trial, trial counsel and the defendant agreed to adopt a defense of consent, and trial counsel prepared an appropriate cross-examination for the victim to support this defense. However, on the day of the trial, the defendant changed his mind and "insisted" that he did not commit the crime and indicated to trial counsel that he would not be waiving his right to testify. The fact that the defendant's strategy of choice resulted in a verdict to his detriment does not then render trial counsel ineffective. Because the right to effective assistance of counsel does not mean that a defendant cedes all participation in his defense to the discretion of trial counsel, a defendant has a right to choose a defense strategy and to reject counsel's advice regarding adverse consequences of that strategy. Trial counsel informed the defendant of the legal strategies at his disposal and the disadvantages of adopting an identity defense in light of the overwhelming DNA evidence against him. Despite trial counsel's warnings that a consent defense was the only "plausible defense" in light of the DNA evidence against the defendant, the defendant made the choice to employ a defense of mistaken identity, and he indicated that he would testify that he had nothing to do with the crime. As a result, trial counsel made a strategic and reasonable decision to craft his trial strategy around the defense of mistaken identity in accordance with the defendant's wishes. The defendant cites to his status as an immigrant, but he has presented no evidence that he was incompetent to assist in his own defense. We conclude that the defendant has not met his burden of proving that trial counsel performed deficiently. The defendant is not entitled to relief as to this claim.

### B. Promise for Defendant to Testify

The defendant argues that trial counsel was ineffective for failing to fulfil his promise in opening statements that the defendant would testify. Specifically, he contends that because trial counsel was aware that his testimony would be inconsistent with the DNA results and aware that the defendant frequently changed his mind in regard to trial strategy, trial counsel should not have promised the jury that the defendant would testify and instead waived his opening statement until the conclusion of the State's proof.

The defendant cites *State v. Zimmerman*, 823 S.W.2d 220 (Tenn. Crim. App. 1991) for the proposition that trial counsel was ineffective. In *Zimmerman*, the defendant was charged with second degree murder, and defense counsel planned to employ a theory of self-defense based upon "battered wife syndrome." *Id.* at 221-22. In opening statements, trial counsel announced that the jury would hear testimony from the defendant and from a psychologist regarding battered wife syndrome. *Id.* However, despite there being "no surprises in the presentation of the state's case," trial counsel advised the defendant not to

testify and did not present the testimony of the psychologist. *Id.* at 224. In concluding that trial counsel provided ineffective assistance, this court reasoned that "there appear[ed] to have been no basis for the sudden change in strategy." *Id.* at 226.

Here, trial counsel testified that he attempted to present a defense that was "consistent with [his] client's wishes." Unlike *Zimmerman*, there was a basis for the change in trial strategy in this case: the defendant himself. Prior to trial, trial counsel had discussions with the defendant about whether he would testify. Trial counsel testified that on the day of the trial, although the defendant changed his mind regarding the consent defense and "insisted" that he did not commit the crime, he informed trial counsel that he still wished to testify. Despite trial counsel's warnings that testifying that he was not at the scene and did not commit the crime was not prudent in light of the State's DNA evidence, the defendant still wished to adopt that trial strategy. When trial counsel made his opening statement, he did so believing that the defendant would testify because the defendant informed trial counsel that he would testify. Trial counsel made a decision to match his theory of defense to the testimony that the defendant indicated he was preparing to give at trial. Trial counsel further testified that after hearing the State's proof, the defendant decided not to testify. Trial counsel was the only witness at the motion for new trial hearing, and his testimony was uncontroverted. In finding that trial counsel performed effectively, the trial court implicitly credited the testimony of trial counsel that the defendant made the decision not to testify. Nothing in the record preponderates against the findings of the trial court, and we conclude that trial counsel did not perform deficiently.

Further, even if trial counsel performed deficiently, the defendant has failed to prove that he suffered prejudice as a result. The evidence presented in this case was overwhelming. Mr. Tribble identified the number of the cab that the victim entered as being either 70, 71, or 77. He provided these numbers to Detective Carrigan, who discovered that the defendant operated taxi cab number 70. The defendant voluntarily provided a DNA sample, which was analyzed by the TBI. Special Agent Everett found that the defendant's DNA profile matched the DNA found on the victim. He stated that the probability of the DNA found on the victim belonging to someone other than the defendant was greater than the world population and that it would be "scientifically unreasonable" to assume that the DNA did not belong to the defendant. The victim also identified the defendant as her attacker before learning of the DNA match. The defendant has not demonstrated that any error by trial counsel in his opening statement likely affected the verdict to his detriment. The defendant is not entitled to any relief as to this claim.

### C. Closing Argument

In his brief, the defendant contends that the following statements from closing

10

argument were unreasonable: "I would submit that in the absence of DNA, this case would have been a loser"; "There was a rape"; and "There was no consent, that is not even an issue." The brief contains no argument or citation to authorities explaining why these statements constituted ineffective assistance of counsel. Therefore, this issue is waived, and the defendant is not entitled to any relief. *See* Tenn. Ct. Crim. App. R. 10(b) ("Issues which are not supported by argument, citation to authorities, or appropriate references to the record will be treated as waived.").

## II. Cumulative Error

The defendant contends that the cumulative effect of trial counsel's errors prejudiced him to the degree that his right to a fair trial was violated. Both the United States and Tennessee Constitutions protect a defendant's right to a fair trial, but they do not guarantee a perfect trial. *Delaware v. Van Ardsall*, 475 U.S. 673, 681 (1986); *State v. Gilliland*, 22 S.W.3d 266, 273 (Tenn. 2000). To consider a claim of cumulative error, "there must have been more than one actual error committed in the trial proceedings." *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010) (citations omitted). The defendant has failed to establish that more than one error was committed during his trial. Therefore, he is not entitled to relief under the cumulative error doctrine.

## CONCLUSION

For the foregoing reasons, we affirm the judgment of the trial court.

_____
JOHN EVERETT WILLIAMS, JUDGE